UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

PETERSON MOTORCARS, LLC and
DAVID PETERSON,                                                       Plaintiffs/Counter Defendants,

v.                                                                   Civil Action No. 3:19-cv-277-DJH-RSE

BMW OF NORTH AMERICA, LLC,                                            Defendant/Counter Claimant.

\* \* \* \* \*

## MEMORANDUM OPINION AND ORDER

Plaintiffs Peterson Motorcars, LLC, and David Peterson initiated this action against Defendant BMW of North America, LLC (BMW NA),[1] alleging (1) breach of contract; (2) breach of the implied covenant of good faith and fair dealing (3) "defamation/trade libel"; (4) tortious interference with contractual relations; (5) violation of the Kentucky Motor Vehicle Sales Act, Ky. Rev. Stat. § 190.070; and (6) violation of the Automobile Dealers' Day in Court Act (ADDCA), 15 U.S.C. § 1221 *et seq.* (Docket No. 1; *see* D.N. 6)  BMW NA counterclaimed for abuse of process (D.N. 61), and now moves to exclude the testimony of Plaintiffs' expert, Steven Sturm, and for summary judgment.[2] (D.N. 88; D.N. 89)  After careful consideration, the Court will grant the motion to exclude and grant in part and deny in part the motion for summary judgment.

---

[1] BMW NA "is the exclusive importer and distributor of MINI motor vehicles and Products in the United States." (D.N. 87-2, PageID.1654)  BMW Aktiengesellschaft (BMW AG) "is responsible for the design and specifications of MINI motor vehicles," and manufactures MINI vehicles. (*Id.*) BMW AG is not a party to this action.

[2] Plaintiffs move for leave "to deem certain documents" timely filed, citing technological issues as the reason for their untimeliness. (D.N. 102)  BMW NA did not respond to the motion.  Because the documents were filed only minutes late (*see* D.N. 102), the length of the delay was minimal and no prejudice will result from the delay.  *See Nafziger v. McDermott Int'l, Inc.*, 467 F.3d 514, 522 (6th Cir. 2006).  Additionally, there is no evidence that Plaintiffs acted in bad faith.  *Id.*  The Court therefore finds "good cause" and "excusable neglect" for the untimeliness and will grant the motion.  Fed. R. Civ. P. 6(b)(1)(B); *see Nafziger*, 467 F.3d at 522.

1

## I.

In 2008, David Peterson, the sole member and manager of Peterson Motorcars, contacted BMW NA about opening a MINI dealership in Louisville, Kentucky, after learning that BMW NA anticipated separating its MINI dealerships from BMW dealerships. (*See* D.N. 87-5, PageID.1763; D.N. 99-1, PageID.2421)  Around this time, he also heard that BMW NA had set an annual sales target of 100,000 MINI vehicles nationally and predicted selling 300 MINI vehicles in the Louisville area annually. (*See* D.N. 99-1, PageID.2419–20; D.N. 99-3, PageID.2435)  BMW NA encouraged Peterson to apply for a MINI dealership and in June 2009 selected his dealership, Peterson Motorcars, as the MINI dealer in the Louisville area. (*See* D.N. 87-1, PageID.1641; D.N. 87-9, PageID.1882; D.N. 99-1, PageID.2421)  Peterson Motorcars and the MINI Division of BMW NA[3] executed a letter of intent on June 25, 2009. (D.N. 87-9)

On January 1, 2010, Peterson Motorcars and the MINI Division entered into a Dealer Agreement. (*See* D.N. 87-4)  The Agreement defined "MINI vehicles" as "passenger cars" bearing the MINI logo and excluded "sport-utility vehicles, pickup trucks, and minivans." (*Id.*, PageID.1689–90)  BMW NA agreed to support Peterson Motorcars in its operations "upon such terms and conditions as the MINI Division considers necessary and appropriate, including" by providing "[n]ational advertising campaigns for MINI Vehicles" and "endeavor[ing] to make a fair and equitable allocation and distribution of the MINI Products available to [Peterson Motorcars] among its MINI Dealers." (*Id.*, PageID.1706)  The Agreement listed "essential elements" of MINI's "image," such as the "MINI branding strategy." (*Id.*, PageID.1710)

---

[3] The "MINI Division of BMW NA," also known as "MINI USA," markets and distributes MINI vehicles in the United States. (*See* D.N. 87-4, PageID.1689)

Peterson Motorcars sold 272 MINI vehicles in 2010 during its first eight months of operation. (D.N. 87-10, PageID.1891)  In 2012, BMW NA again projected that it would sell 100,000 MINI vehicles annually in the United States by 2020. (*See* D.N. 99-4, PageID.2443; D.N. 99-6, PageID.2720)  Peterson Motorcars sold 437 new MINI vehicles in 2013, and MINI sales peaked nationally at 66,502 vehicles. (*See* D.N. 99-4, PageID.2516; D.N. 99-6, PageID.2718)  That same year, David Peterson joined the MINI Dealer Council. (*See* D.N. 87-3, PageID.1661)  After 2013, however, sales for passenger cars, including the MINI, declined nationally as gas prices fell and consumer preference shifted to sport-utility vehicles (SUVs) and light trucks. (*See id.*, PageID.1661–63; D.N. 99-6, PageID.2716; D.N. 99-12, PageID.2824)  In 2015, the Dealer Council raised concerns about the MINI Division's national advertising, characterizing the marketing budget as "underfunded." (D.N. 99-10, PageID.2745)  Sales continued to decline, even as the MINI Division distributed several new models and variants. (*See* D.N. 87-18, PageID.1998–2003; D.N. 99-12, PageID.2824; D.N. 99-20, PageID.3224)

David Peterson was elected Chairman of the Dealer Council in 2017 and told Paul Pedenski, the head of MINI dealer relations, that his fellow MINI dealers were concerned about their profit losses and believed that the MINI Division needed to increase its spending on advertising. (*See* D.N. 87-3, PageID.1668; D.N. 99-10, PageID.2751; D.N. 99-17, PageID.3018)  Later that year, Peterson informed Pedenski that he wanted to step down from the Dealer Council and exit the MINI brand. (*See* D.N. 87-11, PageID.1900; D.N. 99-13, PageID.2879; D.N. 99-20, PageID.3224)  In December 2017, Peterson met with two BMW NA representatives to discuss his exit from his MINI dealership and proposed a buy-out of the remaining $3.1 million debt on the property that housed Peterson Motorcars. (*See* D.N. 87-3, PageID.1671–72)  The parties also discussed a potential "transfer of his MINI franchise in Louisville to the resident BMW Center."

3

(D.N. 99-20, PageID.3224; *see* D.N. 87-3, PageID.1672) Soon after the meeting, Ed Keady, a general manager at Peterson Motorcars, learned that representatives from the Louisville BMW dealership had contacted Peterson Motorcars employees and asked them about a potential sale of the dealership. (*See* D.N. 87-3, PageID.1674) Keady later discovered that James Fox, a BMW NA representative, called the Louisville BMW dealership and told them that Peterson was looking to sell his MINI franchise. (*See* D.N. 87-11, PageID.1894; D.N. 87-19, PageID.2022) Peterson informed Pedenski that he was displeased with the communications from the Louisville BMW dealership. (*See* D.N. 87-3, PageID.1674; D.N. 87-22, PageID.2032; D.N. 99-20; D.N. 99-21)

In March 2018, David Peterson offered the MINI Division, through MINI Division President Thomas Felbermair, his MINI franchise in exchange for BMW NA's payment of the outstanding $3.1 million debt on the franchise and an additional $250,000 for a "ground lease." (D.N. 87-23; *see* D.N. 87-3, PageID.1675–76) In July 2018, Peterson clarified that the offer included only the franchise and not the "land or buildings" associated with the franchise. (D.N. 87-3, PageID.1676) Felbermair recommended to BMW NA that it accept Peterson's offer, but BMW NA instead presented Peterson a counteroffer of $1.7 million for voluntary termination of his MINI franchise, which he rejected. (*See id.*, PageID.1677; D.N. 87-15, PageID.1969; D.N. 99-22, PageID.3231)

The same year, BMW NA implemented a "turnaround plan" for its MINI dealers after considering several other options to improve profitability, including a temporary shutdown of the United States market. (D.N. 87-15, PageID.1962, 1965; *see* D.N. 99-16, PageID.2982–90) The "turnaround plan" provided for an additional $25 million for marketing; a 1 percent increase in "turnaround" for every vehicle sold; and a bonus program for used-car and certified-prior-owner sales. (*See* D.N. 87-15, PageID.1963–64) It also permitted the dealers to reduce costs by

4

integrating their operations into an existing BMW facility. (*See id.*, PageID.1967) Peterson supported the plan, stating that it "created some much-needed enthusiasm" among MINI dealers. (D.N. 87-16, PageID.1972) Yet MINI sales continued to decline; in 2018, BMW NA sold 43,684 MINI vehicles nationally, and Peterson Motorcars sold 164 new MINI vehicles. (*See* D.N. 89-1, PageID.2088; D.N. 99-4, PageID.2516; D.N. 99-16, PageID.2926) David Peterson ultimately sold his MINI dealership in February 2019 for $3.5 million. (*See* D.N. 87-24)

Plaintiffs initiated this action on April 12, 2019, asserting claims for breach of contract (Count I); breach of the covenant of good faith and fair dealing (Count II); defamation/trade libel (Count III); tortious interference with contractual relations (Count IV); and violations of the Kentucky Motor Vehicle Sales Act (Count V) and the ADDCA (Count VI). (D.N. 1; *see* D.N. 6) Plaintiffs amended their complaint on April 19. (D.N. 6) BMW NA moved to dismiss Counts I, II, IV, V, and VI as to David Peterson and Counts IV and V as to Peterson Motorcars (D.N. 15) and for leave to file an amended answer and counterclaim for abuse of process. (D.N. 33) The Court granted BMW NA's partial motion to dismiss on February 19, 2020. (D.N. 43)

After the Court granted the partial motion to dismiss, Plaintiffs moved for leave to file a second amended complaint. (D.N. 48) The Court denied Plaintiffs' motion and granted BMW NA's motion for leave to file an amended answer and counterclaim. (D.N. 60) BMW NA now moves to exclude the testimony of Plaintiffs' expert and for summary judgment on its counterclaim and Plaintiffs' remaining claims: Counts I, II, III, and VI as to Peterson Motorcars and Count III as to David Peterson. (D.N. 88; D.N. 89)

## II.

**A.     Motion to Exclude**

Federal Rule of Evidence 702 permits an expert to "testify in the form of an opinion" only if (1) "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;" (2) "the testimony is based on sufficient facts or data;" (3) "the testimony is the product of reliable principles and methods;" and (4) "the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. "A district court must perform a 'gatekeeping role' to ensure that the testimony meets those mandates." *Madej v. Maiden*, 951 F.3d 364, 369 (6th Cir. 2020). This gatekeeping role "entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 907 (6th Cir. 2004) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592–93 (1993)) (internal quotation marks omitted). The Sixth Circuit has identified "[r]ed flags that caution against certifying an expert"— "reliance on anecdotal evidence, improper extrapolation, failure to consider other possible causes, lack of testing, and subjectivity." *Newell Rubbermaid, Inc. v. Raymond Corp.*, 676 F.3d 521, 527 (6th Cir. 2012) (citing *Best v. Lowe's Home Ctrs., Inc.*, 563 F.3d 171, 177 (6th Cir. 2009)). In sum, the "'*ipse dixit* of the expert' alone is not sufficient to permit the admission of an opinion." *Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 671 (6th Cir. 2010) (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)); *see Kentucky v. Marathon Petro. Co.*, 464 F. Supp. 3d 880, 888-92 (W.D. Ky. 2020).

### 1. Sturm's Opinions

BMW NA moves to exclude the opinions of Plaintiffs' expert, Steven Sturm. (D.N. 88) It asserts that Sturm's opinion that the MINI Division of BMW NA failed to provide "commercially reasonable" marketing and branding support is unreliable. (D.N. 86-2, PageID.1570; *see* D.N. 88) It similarly contends that Sturm's opinion that the MINI Division failed to provide "commercially reasonable" products for sale in the United States from 2010 to 2019 is unreliable and "is based solely upon a factual predicate that does not exist" because BMW NA does not manufacture MINI vehicles.[4] (D.N. 86-2, PageID.1570; *see* D.N. 88)

In his expert report, Sturm compared the growth in BMW SUV sales to MINI sales from 2010 to 2019, including the sales of MINI's two "larger" vehicles, the Countryman and the Clubman. (D.N. 86-2, PageID.1555–58) Because SUVs across brands, including BMW SUVs, performed better than passenger cars in the United States from 2010 to 2019 and the MINI Division did not introduce a vehicle akin to the BMW SUV models, Sturm determined that it did not reasonably support its dealers. (*See id.*, PageID.1553–55) He opined that BMW AG should have "brought additional SUVs and other cross-overs," such as the BMW X1 and X2, into the United States market. (*Id.*) Sturm added the total number of MINI vehicles sold in 2019 to the number of BMW X1 and X2 vehicles sold in 2019 to conclude that if BMW AG had produced a larger MINI vehicle, the MINI Division would have sold an additional 30,000 vehicles in 2019. (*See id.*, PageID.1557–58; D.N. 86-3, PageID.1611–14) He also asserted that the MINI Division "could

---

[4] Sturm offers a third opinion: that the MINI Division did not "reasonably support the dealer network in the United States" because it "fail[ed] to heed the input and requests from the Dealer Council, including the continued and repeated demands for greater . . . marketing" and "for products that were consistent with the market." (D.N. 86-2, PageID.1570) Sturm agreed, and Plaintiffs do not dispute, that this opinion is indistinguishable from his other two opinions. (*See* D.N. 86-3, PageID.1627)

7

have grown to the 100,000 target for US sales" if BMW AG had expanded the MINI lineup beyond models similar to the BMW X1 and X2. (D.N. 86-2, PageID.1555; *see* D.N. 86-3, PageID.1619–20) Notably, Sturm conducted no independent market analysis to support his opinion on production and assumed that there would be no crossover in consumer demand for the hypothetical MINI vehicle and the BMW X1 and X2. (*See* D.N. 86-3, PageID.1613) He also acknowledged that BMW NA is a distributor, not a manufacturer, and he admitted that there was no way to distinguish the impact of allegedly inadequate advertising from production on sales. (*See id.*, PageID.1622, 1624–25)

As to his opinion that the MINI Division of BMW NA failed to provide "commercially reasonable" marketing, Sturm compared the amount that BMW NA spent on marketing MINI vehicles to the total spent by other brands, such as Mazda, Volkswagen, Subaru, Fiat, and Scion. (D.N. 86-2, PageID.1570) He did not account for company size or other potential variables in the comparison. (*See* D.N. 86-3, PageID.1555–58, 1599–1600) Although Sturm stated that there "is a price of admission" to maintain relevance as a national vehicle brand and therefore a minimum that a company must spend to adequately advertise its vehicles, he could not identify this baseline price. (*Id.*, PageID.1600–01) Sturm further explained that no amount of advertising would suffice unless the product was "[r]elevant to the U.S. consumer." (*Id.*, PageID.1604)

    **2.**    **Unreliability**

The Court first notes that, as Sturm acknowledged, BMW AG, not BMW NA, produces MINI vehicles. (*See id.*, PageID.1622) Additionally, there are several "[r]ed flags" cautioning against admission of Sturm's opinion on production, such as his failure to conduct any tests or independent analysis. *Newell*, 676 F.3d at 527. He instead engaged in "improper extrapolation," *id.*, by adding all BMW X1 and X2 sales to total MINI sales to determine how many vehicles the

MINI Division could have sold, even though the MINI Countryman has nearly identical dimensions to the BMW X1. (*See* D.N. 86-3, PageID.1613–15)  Further, his opinion rests on two major, unsupported assumptions: that a MINI vehicle the size of a BMW X1 or X2 would have performed just as well as the BMW X1 and X2 in the United States market and that sales of this hypothetical MINI vehicle would have had no impact on the sales of other MINI vehicles. (*See* D.N. 86-2, PageID.1557–58; D.N. 86-3, PageID.1611–12; *see also* D.N. 88-1, PageID.2068)  His opinion on production therefore rests on "not just one speculation but a string of them."  *Tamraz*, 620 F.3d at 672; *see Newell*, 676 F.3d at 527.

As to marketing, Sturm acknowledged that it is impossible to disentangle the impact of the MINI Division's marketing from BMW AG's production. (*See* D.N. 86-3, PageID.1624–25)  And as with his opinion on production, Sturm conducted no independent analysis. (*See id.*, PageID.1613)  To conclude that the MINI Division failed to provide "commercially reasonable" marketing, Sturm compared the amount that it spent on marketing MINI vehicles to the amount spent by other vehicle companies on marketing, without regard to any number of differentiating factors such as vehicle size; company size; number of dealers; target consumers; type of advertising; or quality of the advertisements. (*See* D.N. 86-2, PageID.1550–53)  This comparison thus failed to consider "other possible causes" of the disparity in spending on marketing and how that disparity impacted sales.  *Newell*, 676 F.3d at 527.  Subjectivity, another "[r]ed flag," also cautions against admission, *id.*: even though Sturm could not determine the minimum amount a company would have to spend on marketing to be "relevant" in the national vehicle market, he stated that the MINI Division had not met that threshold. (D.N. 86-3, PageID.1600–01)

In short, Sturm's reliance on "unsupported speculation" and improper extrapolation and the absence of any independent analysis render his opinions unreliable.[5] *In Re Scrap Metal*, 527 F.3d 517, 529 (6th Cir. 2008). The Court must therefore grant BMW NA's motion and exclude Sturm's opinions. *See Ask Chems., LP v. Comput. Packages, Inc.*, 593 F. App'x 506, 510 (6th Cir. 2014) (finding no abuse of discretion in exclusion of expert's opinion where the expert "cloak[ed] unexamined assumptions in the authority of expert analysis"); *Newell*, 676 F.3d at 528 (determining that exclusion was proper where the expert reached a conclusion "[w]ithout conducting any tests of his own").

**B.     Motion for Summary Judgment**

Summary judgment is required when a movant shows, using evidence in the record, "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). For purposes of summary judgment, the Court must view the evidence in the light most favorable to the nonmoving party. *Loyd v. Saint Joseph Mercy Oakland*, 766 F.3d 580, 588 (6th Cir. 2014) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). If the nonmovant "fails to properly support an assertion of fact or fails to properly address another party's assertion of fact," the fact may be treated as undisputed. Fed. R. Civ. P. 56(e)(2)–(3).

---

[5] Sturm's affidavit, submitted after BMW NA moved to exclude his testimony, attempts to bolster his opinion as to the MINI Division's potential for 100,000 sales nationally by stating that he "performed a[] similar forecast in [his] prior experience." (D.N. 96-1, PageID.2143) He describes how, in his experience, Lexus and Toyota produced vehicles that competed against one another and asserts that therefore BMW NA "did not adequately review or implement similar measures with respect to MINI in the U.S." (*Id.*, PageID.2143–44) Putting aside the fact that BMW AG, not BMW NA, decides which vehicles to manufacture (D.N. 86-3, PageID.1594), Sturm's conclusion is the result of "improper extrapolation" and thus does not remedy the reliability issues previously discussed. *Newell*, 676 F.3d at 528 (affirming exclusion of expert testimony in forklift-accident case where the expert did not conduct his own analysis or test the forklift at issue but rather extrapolated data from other forklift accidents to determine defectiveness).

10

1. **Counts I and II**

    a. **Choice of Law**

Peterson Motorcars asserts breach of contract in Count I and breach of the implied covenant of good faith and fair dealing in Count II. (D.N. 6; *see* D.N. 43)  As an initial matter, the Court must determine which state's law applies to the Dealer Agreement, which contains a New Jersey choice-of-law provision. (D.N. 87-4, PageID.1758)  Although the parties assume that New Jersey law governs the claims (*see* D.N. 89-1; D.N. 98), the Court must apply Kentucky's choice-of-law rules, *see Performance Contracting Inc. v. DynaSteel Corp.*, 750 F.3d 608, 611 (6th Cir. 2014), and "Kentucky courts have an extremely strong and highly unusual preference for applying Kentucky law even in situations where most states would decline to apply their own laws." *Osborn v. Griffin*, 865 F.3d 417, 443 (6th Cir. 2017) (citations omitted).  The Agreement's selection of New Jersey law is therefore not dispositive.  Rather, if Kentucky has the "most significant relationship" to the Agreement and the parties, the Court must apply Kentucky law. *Boling v. Prospect Funding Holdings, LLC*, 771 F. App'x 562, 574 (6th Cir. 2019) (citing *State Farm Mut. Auto. Ins. Co. v. Hodgkiss-Warrick*, 413 S.W.3d 875, 878 (Ky. 2013)).  To determine which state has the most significant relationship, the Court considers "the place or places of negotiating and contracting"; "the place of performance"; "the location of the contract's subject matter"; and "the domicile, residence, place of incorporation and place of business of the parties." *Id.* (quoting *Hodgkiss-Warrick*, 413 S.W.3d at 878–79) (internal quotation marks omitted).

Applying the most-significant-relationship test here, Kentucky law governs for several reasons.  First, both David Peterson and Peterson Motorcars are residents of Kentucky. (*See* D.N. 1; D.N. 6)  Additionally, Kentucky was the key "place of performance" under the Agreement, *Boling*, 771 F. App'x at 574: the MINI Division of BMW NA agreed to sell and deliver vehicles

11

to Peterson Motorcars in Kentucky, and Peterson Motorcars in return agreed to "actively and effectively promote the sale of" MINI vehicles in its "Primary Market Area." (D.N. 87-4, PageID.1703–06, 1717)  Further, the contractual dispute centers around BMW NA's alleged failure to adequately support the Kentucky-based Peterson Motorcars. (*See* D.N. 6; D.N. 89-1; D.N. 98)  The only connection to New Jersey is BMW NA's residence. (*See* D.N. 5 (noting that BMW NA is a citizen of both New Jersey and Delaware))

This case differs from the Court's recent decision in *PSC Industries, Inc. v. Yarbrough Technical Associates, Inc.*, 2022 WL 3587354 (W.D. Ky. Aug. 22, 2022), in which the Court applied the parties' New York choice-of-law clause to the contractual dispute. In *PSC*, the only connection to Kentucky was the residence of the plaintiff, and importantly, the Court determined that New York was the "place of performance" under the contract. *Id.* at *7. Unlike *PSC*, this "dispute is centered in Kentucky," where both Plaintiffs reside and Peterson Motorcars operated. *Osborn*, 865 F.3d at 444 (citing *Hackney v. Lincoln Nat'l Fire Ins. Co.*, 657 F. App'x 563, 570 (6th Cir. 2016)); *see PSC*, 2022 WL 3587354, at *7. Accordingly, in light of Kentucky courts' "extremely strong and highly unusual preference for applying Kentucky law," the Court will apply Kentucky law to Counts I and II. *Osborn*, 865 F.3d at 443; *see AssuredPartners of Ky., LLC v. English*, No. 3:21-CV-493-DJH-RSE, 2021 WL 7081110, at *4 (W.D. Ky. Aug. 18, 2021) (applying Kentucky law when "no facts" indicated that Florida, the state law designated by the contract, had "the most significant relationship to the contract besides the choice-of-law provision"); *cf. PSC*, 2022 WL 3587354, at *7.

        **b.**    **Application**

Under Kentucky law, a breach-of-contract claim requires a plaintiff to demonstrate (1) the existence of a contract; (2) breach of the contract; and (3) that the breach caused damages. *See*

*Morris v. Tyson Chicken, Inc.*, 497 F. Supp. 3d 282, 288 (W.D. Ky. 2020) (citing *Wood v. State Farm Fire & Cas. Co.*, No. 2019-CA-000462-MR, 2020 WL 1898401, at *3 (Ky. Ct. App. Apr. 17, 2020)). Every contract also "contains an implied covenant of good faith and fair dealing." *Id.* (quoting *Mountain Motorsports Paving & Const. LLC v. Yamaha Motor Corp., U.S.A.*, No. CIV. 14-76-ART, 2014 WL 5341865, at *5 (E.D. Ky. Oct. 20, 2014)) (internal quotation marks omitted). To demonstrate breach of the implied covenant of good faith and fair dealing, a plaintiff must show "that the party alleged to have acted in bad faith has engaged in some conduct that denied the benefit of the bargain originally intended by the parties." *Id.* at 289 (quoting *KSA Enters., Inc. v. Branch Banking & Tr. Co.*, 761 F. App'x 456, 461 (6th Cir. 2019)) (internal quotation marks omitted).

Peterson Motorcars argues that BMW NA breached the Dealer Agreement by inadequately supporting the MINI brand. (*See* D.N. 98, PageID.2398–2401) Specifically, it asserts that the MINI Division of BMW NA provided insufficient marketing and failed to introduce new products, despite knowing that the consumer preference for passenger cars was declining. (*See id.*) These failures, Peterson Motorcars contends, also breached the implied covenant of good faith and fair dealing. (*See id.*, PageID.2401–09)

As to production, the Agreement required the MINI Division to distribute, not manufacture, new vehicles. (*See* D.N. 87-4, PageID.1687, 1706) Peterson Motorcars has acknowledged that BMW AG decides which MINI vehicles to manufacture and actually manufactures those vehicles. (*See* D.N. 87-3, PageID.1664) It therefore cannot show that BMW NA breached the Agreement based on its alleged insufficient production of new MINI vehicles. *See Paris Packaging, Inc. v. Flint Grp. N. Am. Corp.*, No. 3:10-CV-460-H, 2011 WL 5122639, at *3 (W.D. Ky. Oct. 28, 2011) (noting that a party "cannot breach a contract term to which it never agreed").

### i.     Breach of Express Term

BMW NA agreed to support Peterson Motorcars "upon such terms and conditions as the MINI Division considers necessary and appropriate" and to provide "[n]ational advertising campaigns for MINI Vehicles." (D.N. 87-4, PageID.1706)  The Agreement also stated that "[e]-commerce" would be a "core element of the MINI passenger car business model." (*Id.*, PageID.1713)  Notably, Peterson Motorcars does not assert that BMW NA failed to provide any national advertising, nor could it—the undisputed record shows that the MINI Division spent at least $65 million on Tier 1 marketing[6] annually from 2013 to 2019.  (D.N. 87-18, PageID.1994) Peterson Motorcars instead argues that BMW NA failed to sufficiently market MINI vehicles, causing Peterson Motorcars' profit losses.  (*See* D.N. 98, PageID.2398–2401)

But the Agreement provided BMW NA discretion in how it chose to market the MINI (*see* D.N. 87-4, PageID.1706–13), and its contractual obligation therefore was to exercise its discretion "reasonably and with proper motive, and [not] arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectations of the parties." *Time Warner Cable Midwest LLC v. Pennyrile Rural Elec. Coop. Corp.*, No. 5:15-CV-45-TBR, 2015 WL 4464105, at *4 (W.D. Ky. July 21, 2015) (alteration in original) (quoting *Deom v. Walgreen Co.*, 591 F. App'x 313, 317 (6th Cir. 2014)) (internal quotation marks omitted).  In the absence of breach of an express term, Peterson Motorcars' claim in Count I is appropriately analyzed as a claim for breach of the implied duty of good faith and fair dealing.  *See Epps Chevrolet Co. v. Nissan N. Am., Inc.*, 99 F. Supp. 3d 692, 703 (E.D. Ky. 2015) (noting that a claim for breach of the covenant of good faith and fair dealing "may be asserted as a claim for breach of an implied term of a contract"); *Time Warner*, 2015 WL

---

[6] Tier 1 marketing is nationwide advertising paid for by the MINI Division of BMW NA. (*See* D.N. 99-10, PageID.2744)

4464105, at *4. Yet for the reasons explained below, Peterson Motorcars has failed to sufficiently prove such a claim. *See Morris*, 497 F. Supp. 3d at 288–90.

### ii.     Breach of the Implied Covenant of Good Faith and Fair Dealing

Peterson Motorcars has presented no evidence showing that BMW NA breached the implied covenant of good faith and fair dealing. It points out that the MINI Division recognized that sales were declining yet failed to spend enough on advertising to ameliorate the decline. (*See* D.N. 98, PageID.2401–09) But the MINI Division spent more on advertising from 2013 to 2019, when MINI sales declined, than it did before this period. (*See* D.N. 87-18, PageID.1994) Moreover, Peterson Motorcars has explicitly denied any bad faith or improper motive on BMW NA's part. (*See* D.N. 87-3, PageID.1668)

Simply put, Peterson Motorcars has provided no evidence that the MINI Division of BMW NA acted in bad faith or denied Peterson Motorcars the benefit of its bargain by choosing to spend a certain amount on marketing. *See Morris*, 497 F. Supp. 3d at 289–90. Accordingly, the Court must grant summary judgment on Counts I and II. *See id.* (granting summary judgment on plaintiffs' claim that defendant breached the implied covenant of good faith and fair dealing where plaintiffs failed to provide any evidence that defendant "engaged in some conduct that denied the benefit of the bargain originally intended by the parties").

### 2.     Count III

Plaintiffs assert defamation and trade libel in Count III. (*See* D.N. 6, PageID.124) BMW NA moved for summary judgment on this claim, and Plaintiffs failed to discuss Count III in their response. (*See* D.N. 89-1; D.N. 98) The Court will therefore deem Count III abandoned. *See Nathan v. Great Lakes Water Auth.*, 992 F.3d 557, 564 n.1 (6th Cir. 2021) (determining that plaintiff "abandoned" certain claims by failing to discuss them in his response to defendant's

15

summary judgment motion (citing *Brown v. VHS of Mich., Inc.*, 545 F. App'x 368, 372 (6th Cir. 2013))). Even considering the claim on the merits, Plaintiffs have not provided any evidence supporting Count III, and BMW NA is thus entitled to summary judgment on this claim. *See Loyd*, 766 F.3d at 588.

### 3. Count VI

In Count VI, Peterson Motorcars asserts that BMW NA violated the Automobile Dealers' Day in Court Act. (D.N. 6, PageID.126–27; *see* D.N. 98, PageID.2409–10) The ADDCA prohibits an "automobile manufacturer"[7] from failing "to act in good faith in performing or complying with any of the terms or provisions of the franchise." 15 U.S.C. § 1222. It narrowly defines "good faith" as "the duty of each party to any franchise . . . to act in a fair and equitable manner toward each other so as to guarantee the one party freedom from coercion, intimidation, or threats of coercion or intimidation from the other party." § 1221(e). The ADDCA therefore does not permit recovery "in the absence of coercion, intimidation, or threats." *Epps*, 99 F. Supp. 3d at 705 (quoting *Fray Chevrolet Sales, Inc. v. Gen. Motors Corp.*, 536 F.2d 683, 685 (6th Cir. 1976)) (internal quotation marks omitted). Peterson Motorcars has offered no evidence indicating that BMW NA engaged in coercion, intimidation, or threats. Accordingly, summary judgment is required on Count VI. *See George Lussier Enters., Inc. v. Subaru of New England, Inc.*, 393 F.3d 36, 45 (1st Cir. 2004) ("Summary judgment is therefore proper if a plaintiff dealer fails to offer

---

[7] The ADDCA defines "automobile manufacturer" as "any person, partnership, corporation, association, or other form of business enterprise engaged in the manufacturing or assembling of passenger cars . . . including any person, partnership, or corporation which acts for and is under the control of such manufacturer or assembler in connection with the distribution of said automotive vehicles." § 1221(a). The parties do not dispute that BMW NA fits this statutory definition of an "automobile manufacturer." *Id.*

evidence showing a wrongful demand and sanctions, and thus coercion, under the ADDCA's good-faith requirement.").

### 4. Counterclaim

BMW NA moves for summary judgment on its counterclaim for abuse of process against Plaintiffs. (D.N. 89; *see* D.N. 61) Under Kentucky law, "abuse of process is 'the irregular or wrongful employment of a judicial proceeding'" and requires a showing of "ulterior purpose" and "a willful act in the use of process not proper in the regular conduct of the proceeding." *Sprint Commc'ns Co., L.P. v. Leggett*, 307 S.W.3d 109, 114 (Ky. 2010) (quoting *Simpson v. Laytart*, 962 S.W.2d 392, 394 (Ky. 1998)). To succeed on a claim for abuse of process, "some definite act or threat not authorized by process, or aimed at an objective which is not a legitimate use of the process [i]s required." *Id.* (citing *Simpson*, 962 S.W.2d at 394). BMW NA argues that there is no genuine dispute that David Peterson offered MINI Division President Felbermair his dealership for BMW NA's payment of the $3.1 million debt on the franchise; rejected BMW NA's counteroffer of $1.7 million; and then initiated this action, disclosing "confidential information" in the complaint. (D.N. 89-1, PageID.2098–99; *see* D.N. 1; D.N. 87-23; D.N. 87-3, PageID.1675–76) BMW NA contends that because Peterson could not legally recover the debt from BMW NA yet still "demanded" that it pay him $3.1 million, it is entitled to summary judgment on its counterclaim. (D.N. 89-1, PageID.2098–99)

The Court disagrees. There is a genuine dispute as to whether Peterson made his initial offer with an "ulterior motive." *Sprint*, 307 S.W.3d at 114. He testified that his offer was intended to give BMW NA "something to think about" and was not "a demand." (D.N. 87-3, PageID.1676) According to Peterson, he proposed the offer to permit the parties to "walk away" from the relationship. (*Id.* ("I'm talking to someone saying is there a way we can find a way that both of us

17

feel like we got something that's positive and let me walk away.")) And while Felbermair described feeling "threatened and blackmailed" from Peterson's rejection of the counteroffer (D.N. 87-15, PageID.1969), Peterson stated only that he was "dismissive" of the counteroffer. (D.N. 87-3, PageID.1677) Taking the evidence in the light most favorable to Plaintiffs, as the Court must do, a genuine dispute of material fact exists as to ulterior motive, and the Court will accordingly deny summary judgment on the counterclaim. *See Loyd*, 766 F.3d at 588; *cf. Miller v. Javitch Block, LLC*, No. 3:15-CV-00746-CRS-CHL, 2017 WL 1658941, at *7 (W.D. Ky. May 1, 2017) (granting summary judgment on plaintiff's abuse-of-process claim where he provided no evidence that defendant had an ulterior motive).

### III.

BMW NA has demonstrated that Sturm's opinions are unreliable and should therefore be excluded. *See Newell*, 676 F.3d at 528. Additionally, summary judgment is appropriate on Counts I and II because Peterson Motorcars has failed to show that BMW NA had a duty to produce MINI vehicles under the parties' agreement or that BMW NA exercised its discretion to provide marketing unreasonably or in bad faith. *See Morris*, 497 F. Supp. 3d at 289–90; *Time Warner*, 2015 WL 4464105, at *4. The Court must also grant summary judgment on Count III because Plaintiffs abandoned the claim and on Count VI because Peterson Motorcars provided no evidence of bad faith, threats, or coercion. *See Nathan*, 992 F.3d at 564 n.1; *Epps*, 99 F. Supp. 3d at 705. The Court will deny summary judgment on BMA NA's counterclaim, however, because a genuine dispute of material fact exists as to whether Peterson acted with an "ulterior motive." *Sprint*, 307 S.W.3d at 114. Accordingly, and the Court being otherwise sufficiently advised, it is hereby

  **ORDERED** as follows:

  (1) Plaintiffs' motion to deem documents timely filed (D.N. 102) is **GRANTED**.

(2)   BMW NA's motion to exclude the testimony of Plaintiffs' expert Steven Sturm (D.N. 88) is **GRANTED**.

(3)   BMW NA's motion for summary judgment (D.N. 89) is **GRANTED** in part and **DENIED** in part.  It is **GRANTED** as to Counts I, II, III, and VI.  It is **DENIED** as to BMW NA's counterclaim.

(4)   The Court requests that within **thirty (30) days of entry** of this Memorandum Opinion and Order, Magistrate Judge Regina S. Edwards (*see* D.N. 24) conduct a status conference with the parties to set a final trial schedule and, at her discretion, a settlement conference.

September 9, 2022

David J. Hale, Judge
United States District Court